## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Apr 04 2017, 8:46 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Evan K. Hammond
Marion, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Ellen H. Meilaender
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Jeremy Alan Riddle,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

April 4, 2017

Court of Appeals Case No.
27A02-1606-CR-1491

Appeal from the Grant Superior Court

The Honorable Jeffrey D. Todd, Judge

Trial Court Cause No.
27D01-1512-F2-12

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Defendant, Jeremy Alan Riddle (Riddle), appeals his convictions for burglary, a Level 2 felony, Ind. Code §§ 35-43-2-1(3)(A), -41-2-4; robbery while armed with a deadly weapon, a Level 3 felony, I.C. §§ 35-42-5-1, -41-2-4; conspiracy to commit burglary, a Level 2 felony, I.C. §§ 35-43-2-1(3)(A), -41-5-2; and conspiracy to commit robbery while armed with a deadly weapon, a Level 3 felony, I.C. §§ 35-42-5-1, -41-5-2.

We affirm.

# ISSUE

Riddle raises one issue on appeal, which we restate as follows: Whether the State presented sufficient evidence to support Riddle's convictions beyond a reasonable doubt.

# FACTS AND PROCEDURAL HISTORY

On the morning of November 11, 2015, Pamela Balsis (Balsis) was getting ready to join her next-door neighbor, John Holloway (John), for their daily cup of coffee at his home when her dog began barking. The dog's barking alerted Balsis to her front window, where she noticed a white car parked in front of her house that "didn't belong" in her small neighborhood in Marion, Grant County, Indiana. (Tr. Vol. I, p. 57). Balsis observed that there was a white man with dark facial hair sitting in the backseat, wearing a hooded sweatshirt, who kept looking back over his shoulder in the direction of John's house. After some time, Balsis determined that she would get dressed and then "call

somebody" about the suspicious vehicle. (Tr. Vol. I, p. 61). However, by the time she finished and looked out her window, the vehicle was gone.

[5] Meanwhile, next door, eighty-three-year-old John and his sixty-one-year-old son, Larry Holloway (Larry), had been sitting in John's garage smoking cigarettes. Larry suffers from a plethora of serious medical issues and, at the time, had recently been released from the hospital. Larry's wife, Leanne Riddle, had passed away the prior year, so Larry lived alone. Thus, he was temporarily living with John until he was recovered well enough to go home and care for himself. Shortly before 9:00 a.m., John and Larry heard a very loud banging coming from the front door; John got up to investigate, while Larry remained in the garage. John observed "a young man"—white and appearing to be in his twenties—standing on his front porch, who asked John whether he had any work available, such as raking leaves. (Tr. Vol. I, p. 78). When John explained that he was not in need of any services, the stranger opened John's screen door, pulled out a gun from his pocket, stepped into John's living room, and demanded money and drugs.

[6] The gunman seemed "real nervous" and was "shakin' [the gun] back and forth and pointin' it towards the floor." (Tr. Vol. I, p. 79). When John informed the intruder that he had neither drugs nor money, the man specifically inquired about Larry. Around that time, sensing that something was not right with his father, Larry entered from the garage. When confronted with the gunman's demand for money and drugs, Larry responded that it would be in the young man's best interests to turn around and leave their house. The perpetrator

repeatedly stated that he did not "wanna do this" but was being forced to do so by people whom he refused to identify when pressed by John and Larry. (Tr. Vol. I, p. 79). Nevertheless, he seemed insistent on procuring drugs from Larry, stating that "they told me you had prescription drugs." (Tr. Vol. I, p. 112). Larry, however, convinced the gunman that his narcotic painkillers had been taken away at the hospital.

[7] Because the gunman seemed scared and dejected, Larry made a sudden move in an attempt to smack him, which only prompted the perpetrator to cock his pistol and point it at Larry. Larry heeded the gunman's directive to "back off" and the gunman subsequently indicated his intent to leave. (Tr. Vol. I, p. 114). The gunman ordered John and Larry to go wait in the bedroom until he left, but John and Larry refused. Instead, they agreed to simply walk to the end of the hallway, which they did, and at which point John retrieved his firearm from his bedroom. When they walked back into the living room, the intruder had fled. Larry looked out the window and saw the perpetrator entering the backseat of a white vehicle, in which there also appeared to be another passenger in addition to the driver. John noticed that his wallet, which had been on the kitchen counter and within reach of the gunman, was gone. It had contained $213.00 in cash. At 8:54 a.m., John and Larry called the police.

[8] Later that morning, at 10:10 a.m., Tiffany Riddle (Tiffany), an inmate at the Howard County Jail, called her husband, Riddle. At the beginning of the call, an automated message informed Tiffany and Riddle that their call would be recorded and subject to monitoring by law enforcement personnel. Despite this

warning, and as they had done in prior telephone conversations, Tiffany and Riddle discussed the efforts that Riddle was undertaking to raise money to bail Tiffany out of jail. Riddle assured Tiffany that he was "on a mission to get [her] out" and that he had already "done several things [he] could go to prison for fifty years." (Tr. Vol. I, p. 179). Riddle elaborated that he, along with Tiffany's brother, Ronald Reed (Reed), had "tried to do something that morning" that could have been worth thousands of dollars, but Reed had "screwed it up." (Tr. Vol. I, p. 190). Believing that Riddle had implicated himself in a crime, the investigator listening to the phone calls accessed the Marion Police Department's call log and discovered the reported robbery earlier that morning at John's home. Accordingly, the investigator advised the Marion Police Department to further investigate Riddle and Reed as suspects in the case.

[9] Based on the information received through the jailhouse phone calls, and considering the fact that John and Larry would have recognized Riddle—who is Larry's step-grandson, the Marion police officers determined that it was likely that Reed was the acting gunman. Accordingly, the officers assembled a photo array that included Reed's photograph, and both John and Larry separately identified him as the perpetrator.[1] Furthermore, in the course of investigating

---

[1] Initially, Larry provided the police officers with a photograph of a possible suspect, Brandon Vandiver (Vandiver), who, according to Larry, "really looked close to what the guy looked like." (Tr. Vol. I, p. 129). Vandiver was related to Larry's deceased wife, Leanne Riddle, through marriage. Because Vandiver was incarcerated at the time of the instant offense, he was quickly cleared as a suspect. Moreover, Larry indicated that as soon as he saw the photo array, he realized that he had been mistaken in believing that

other crimes involving Riddle, officers searched the property where Riddle had been living on November 11, 2015, and discovered a Taurus nine-millimeter semi-automatic handgun with a brushed silver top and black handle stowed in a well-casing. Larry confirmed that the recovered firearm "look[ed] just like the one that [Reed] pointed at [him]." (Tr. Vol. I, p. 125). The officers also retrieved cell phone tower data and determined that Riddle's cell phone was used in the general vicinity of John's home shortly after the commission of the present offense.

[10] On December 9, 2015, the State filed an Information. At some point, it appears that the Information was amended to charge Riddle with the following: Count I, aiding, inducing, or causing a burglary, a Level 2 felony, I.C. §§ 35-43-2-1(3)(A), -41-2-4; Count II, aiding, inducing, or causing a robbery while armed with a deadly weapon, a Level 3 felony, I.C. §§ 35-42-5-1, -41-2-4; Count III, conspiracy to commit burglary, a Level 2 felony, I.C. §§ 35-43-2-1(3)(A), -41-5-2; and Count IV, conspiracy to commit robbery while armed with a deadly weapon, a Level 3 felony, I.C. §§ 35-42-5-1, -41-5-2.[2] On March 14 through 17, 2016, the trial court conducted a jury trial. At the close of the evidence, the jury returned a guilty verdict on all four Counts. On May 31, 2016, the trial court held a sentencing hearing and imposed the maximum sentence on each Count.

---

Vandiver could have been the suspect because when he saw Reed in the photo array, it was "[l]ike he was standin' right there in front of me, and I could see those eyes." (Tr. Vol. I, pp. 131-32).

[2] The amended version of the Information is not included in the appellate record.

Accordingly, the trial court ordered thirty years each for the burglary and conspiracy to commit burglary charges and sixteen years each on the armed robbery and conspiracy to commit armed robbery charges. The trial court ordered the sentences to run concurrently, resulting in an aggregate term of thirty years, fully executed in the Indiana Department of Correction.

[11] Riddle now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

[12] Riddle challenges the sufficiency of the evidence supporting his convictions. In reviewing such a claim, our standard is well settled. Our court neither reweighs evidence nor assesses the credibility of witnesses. *Stewart v. State*, 866 N.E.2d 858, 862 (Ind. Ct. App. 2007). We consider the evidence most favorable to the conviction, along with any reasonable inferences that may be drawn from that evidence. *Id.* "We will affirm a conviction if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt." *Id.*

[13] In order to convict Riddle of burglary as a Level 2 felony (Count I), the State was required to prove that he knowingly or intentionally aided, induced, or caused another person—*i.e.*, Reed—to break and enter John's home with the intent to commit a felony or theft, while armed with a deadly weapon. I.C. §§ 35-43-2-1(3)(A), -41-2-4. As to the related charge of conspiracy to commit burglary as a Level 2 felony (Count III), the State had to prove that Riddle

agreed with another person—*i.e.*, Reed—to commit the burglary and that an overt act was performed in furtherance of the agreement. I.C. §§ 35-43-2-1(3)(A), -41-5-2. For Riddle's conviction of Level 3 felony robbery while armed with a deadly weapon (Count II), the burden was on the State to prove that Riddle knowingly or intentionally aided, induced, or caused another person—again, Reed—to knowingly or intentionally take property from John or Larry by using or threatening the use of force or by putting them in fear, while armed with a deadly weapon. I.C. §§ 35-42-5-1, -41-2-4. Finally, concerning Riddle's conviction for conspiracy to commit armed robbery (Count IV), the State had to prove that Riddle agreed with another person—*i.e.*, Reed—to commit the armed robbery and that an overt act was performed in furtherance of the agreement. I.C. §§ 35-42-5-1, -41-5-2.

[14] For each of these four charges, Riddle challenges only the identification element—that is, he insists that the State failed to prove beyond a reasonable doubt that he was the perpetrator of each of the aforementioned offenses. In fact, he claims that there is no evidence that Riddle was present at the crime scene during the burglary/robbery or at any other point and that Reed was the only suspect identified. Furthermore, Riddle contends that while the jailhouse phone calls did discuss other specific victims in his criminal activity spree, John and Larry were not explicitly mentioned. Thus, according to Riddle, "[t]he suggestion that [he] had any involvement with the above-mentioned crimes is merely speculation and cannot pass the reasonable doubt standard." (Appellant's Br. p. 11). We disagree.

As with the other elements of a crime, a perpetrator's identity may be established entirely by circumstantial evidence and the logical inferences drawn therefrom. *Bustamante v. State*, 667 N.E.2d 1313, 1317 (Ind. 1990). On appeal, our court "need not determine whether the circumstantial evidence is adequate to overcome every reasonable hypothesis of innocence, but rather whether inferences may be reasonably drawn from that evidence which support the verdict beyond a reasonable doubt." *Id.* at 1318. Here, the evidence most favorable to the jury's verdict establishes that Larry was married to Riddle's grandmother for a decade. During that time, Larry and Riddle frequently interacted, and Riddle was aware that Larry suffered from a multitude of health problems that required him to take narcotic pain medicine. As a stranger to John and Larry, Reed (who is Riddle's brother-in-law) would not have had personal knowledge that Larry was temporarily living with John due to a recent hospitalization or that Larry would be in possession of narcotic painkillers. Yet, when Reed entered John's house on the morning of November 11, 2015, he had clearly received information that Larry would be there, and he repeatedly demanded that Larry surrender his narcotic painkillers. When Larry indicated that he was not in possession of such, Reed was adamant that "they told me you had prescription drugs." (Tr. Vol. I, p. 112).

Merely an hour after Reed's failed attempt to steal Larry's medication, Tiffany called Riddle from jail. Although Riddle was hesitant to give specific details about the events of the morning, he reassured Tiffany that he was "on a mission to get [her] out" of jail and that he had already "done several things [he] could

go to prison for fifty years." (Tr. Vol. I, p. 179). Riddle explained that he and Reed had "tried to do something that morning" that could have been worth thousands of dollars, but Reed had "screwed it up." (Tr. Vol. I, p. 190). Furthermore, evidence from prior jailhouse phone calls between Tiffany and Riddle also indicate that Riddle and Reed had committed other crimes together in the days leading up to the robbery/burglary of John and Larry. In these calls, Riddle specifically referred to Reed as his partner and a professional and discussed with Tiffany having to split the proceeds of criminal undertakings with Reed.

[17] Although it is undisputed that Reed was the only individual to enter John's house and demand money and drugs, Balsis and Larry both testified that along with the driver, there was at least one other person in the back seat of the white getaway car. Balsis testified that this individual kept checking over his shoulder in the direction of John's house. The State also presented evidence that Riddle's cell phone had been used a short time after the crime was committed within the relative vicinity of John's house. Finally, the evidence reveals that the police officers recovered a firearm on Riddle's property, which contained Riddle's DNA. The nine-millimeter semi-automatic handgun had a brushed silver top and a black handle, and Larry immediately identified it as appearing to be the same weapon that Reed had used in the commission of the burglary and robbery. Accordingly, we conclude that the evidence provides ample support for the jury's determination that Riddle acted as both the accomplice

(*i.e.*, he aided, induced, or caused Reed to commit the offenses) and the co-conspirator in this case.

# CONCLUSION

[18] Based on the foregoing, we conclude that the State presented sufficient evidence to support Riddle's convictions for burglary, robbery while armed with a deadly weapon, conspiracy to commit burglary, and conspiracy to commit robbery while armed with a deadly weapon beyond a reasonable doubt.

[19] Affirmed.

[20] Crone, J. and Altice, J. concur